Samuel R. PIERCE, Jr., Secretary of Housing and Urban Development, Plaintiff-Appellee,

v.

VISION INVESTMENTS, INC., Vision Village, Inc., Lakin D. Kirk, and Nancy J. Kirk, Defendants-Appellants.

No. 84–1642.

United States Court of Appeals, Fifth Circuit.

July 19, 1985.

---

**540**

Wayne Dickey, Waco, Tex., for defendants-appellants.

Mark H. Gallant, Mark B. Stern, Dept. of Justice, Civ. Div., Washington, D.C., for plaintiff-appellee.

Before WISDOM, WILLIAMS, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

In this appeal from a civil contempt judgment for failure to comply with the payment terms of a consent order, the contemners urge us to apply the prohibition against imprisonment for debt of 28 U.S.C. § 2007(a) and Tex. Const. art. I, § 18. Finding that the district court's use of contempt sanctions to enforce the payment terms of the order falls within the scope of the section 2007(a) prohibition and that Texas law does not provide an exemption from the prohibition, we vacate the contempt judgment and remand the case to the district court.

## I. FACTS AND PROCEDURAL HISTORY

The Secretary of Housing and Urban Development (Secretary) brought a suit to enforce the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.*, against Lakin Kirk and his wife, Nancy Kirk, who through family corporations[1] had allegedly violated the Act in developing Club Park subdivision in Hill County, Tex-

---

1. The two corporations, also defendants in the suit, are Vision Investments, Inc., and Vision Villages, Inc. Lakin Kirk was the President of both corporations and Nancy Kirk was the Vice President and Secretary of both corporations.

as. The suit was settled; the consent order permanently enjoined the Kirks from engaging in activities considered unlawful by the Secretary and required monies to be paid to Club Park purchasers who had lost their lots upon foreclosure against the Kirks. The consent order also required that within fifteen days the Kirks appoint an independent escrow agent to be approved by the Secretary, and that within ninety days they file an affidavit with the Secretary listing the purchasers holding title to or due a conveyance of one or more Club Park lot(s) prior to the foreclosure. Finally, the consent order provided for the following schedule of payments to be made to the escrow agent (who in turn would distribute the monies to the Club Park lot purchasers): $10,000 to be paid by April 28, 1983; $11,000 to be paid by April 28, 1984; and $12,000 to be paid by April 28, 1985.

On February 4, 1983, the Secretary filed a motion for judgment of contempt based on the Kirks' failure to appoint an escrow agent and to file the list of Club Park lot purchasers. Subsequently, the Secretary acknowledged receipt of the list and of the name of an acceptable escrow agent, but sought the contempt judgment for failure to pay the $10,000 due on April 28, 1983.

At a hearing on August 19, 1983, testimony was introduced concerning the Kirks' inability to make the payment due.[2] The testimony also included the fact that from

---

**2.** The testimony of Lakin Kirk concerning his inability to make the $10,000 payment included the following:

Q. Mr. Kirk, I need to ask you about this payment that became due April 28, 1982 [sic]. Did you have the money to pay that payment at that time?
A. No.
Q. And have you thought about taking bankruptcy?
A. Oh, yeah, think about that.
Q. If you would, go through some of the debts that you owe right now as a result of this foreclosure, banks, etc., the debts you owe right now.
A. Well, I have two judgments from two insurance companies that were involved with me at that particular time, and I believe that they amount to about 25 thousand dollars in the Dallas area. As a result of this, I owe to two banks a total of probably 65 thousand dollars from old debts left over from that era.
I have another 15 thousand to another bank that loaned me money to buy a house. And then I would imagine five to seven thousand dollars of accounts payable is left. These are corporate debts. I figure they are my responsibility.
Q. These are current debts, right? They are current right now. They are due right now?
A. Well, they are running—the accounts payable are way behind, but they are the core of what is left. And the other is within 30 days of being current.

&ast;&ast;&ast;&ast;&ast;&ast;

Q. Do you have any property that does not have a loan on it?
A. No.
Q. Other than just, you know, the stuff around your house like silverware or plates or stuff? I'm talking about the usual things like cars, trucks, houses, any land.
A. No, I have no assets without a lien.

&ast;&ast;&ast;&ast;&ast;&ast;

Q. What about relatives? Have you got any relatives you can borrow this money from, this ten thousand dollars?
A. No.
Q. Will these banks loan you this ten thousand dollars?
A. No, not for this purpose.
Q. Why?
A. I recently talked to three of these four banks that I was involved with, and the one says they would lend me more money to get back into business, but that's all.
Q. When did you talk about getting back into business? What are you going to be doing? Are you managing a business, or what?
A. Well, right now we are running—I'm running a drape route, but that's going to grow into a drape business that I hope to make quite large, cleaning drapes, commercial drapes only.
Q. Do you do the cleaning, yourself?
A. I do the cleaning, myself, right now, but we intend also to hire other people to grow.

&ast;&ast;&ast;&ast;&ast;&ast;

Q. How many hours a day do you work cleaning these drapes?
A. Well, we work 12 hours in our business a day, at least.
Q. What time do you generally get home from work?
A. Nancy and I don't get home—that doesn't really matter, does it?
Q. Well, it does matter in regard to whether or not you are working hard trying to make this ten thousand dollars.
A. Well, I'm working hard.

&ast;&ast;&ast;&ast;&ast;&ast;

Q. So all the funds that you have testified to here today, the lack of them, goes for Mrs. Kirk, also?
A. Uh-huh.

the sale of a dry cleaning business the Kirks presently had $20,000 in a bank account. The unavailability of this money was, however, explained as follows:

Well, I have a note there at that bank, and the understanding that we have is that the proceeds of that money can go towards another business, which I'm in the process of setting up just a drape-cleaning business, and if anything is left, that must go towards my note [of $60,-000]. He loaned the money to buy the dry cleaners to begin with.

At the conclusion of the hearing, the Secretary's attorney suggested that the Kirks "be ordered to submit an affidavit ... listing with specificity all their assets and location and value of those assets" in order that the court could order liquidation of specific assets to satisfy the amount due under the consent order.

The court, observing that "you can't get blood out of a turnip," suggested to the government that it "try to initiate some sort of a payment schedule based upon the problems that the defendants have had to try to insure payment in a reasonable manner when and if these defendants get back on their feet again." The court reiterated its belief that the Kirks could not immediately pay the full amount due and declined to issue a contempt judgment, explaining its decision as follows:

It appears to me this defendant or these defendants are in dire financial straits, I don't like to order defendants to do things which are beyond their capacity to do reasonably so, and I'm just not willing to do that. I have been satisfied at this point that these defendants do not have the ability to pay ten thousand dollars today.

The question is whether you can work with Mr. Dickey and with his clients to perhaps revise this consent order based upon them getting back on their feet again. It's not going to do the government any good or the creditors, the people who might have been defrauded, any good for this court to hold these defendants in contempt requiring them to do something which they can not do.

But I think with reasonable minds working together and allowing these individuals an opportunity to get back on their feet again, if indeed they can, that perhaps the requirements originally envisioned within the consent decree be met.

The court then required the Kirks to submit sworn statements of current assets, taking the motion for contempt under advisement "until the parties notify the court as to the availability of assets and any revised payment schedule."

On May 14, 1984, the Secretary filed a post-hearing memorandum in support of the contempt motion. Without holding a new hearing, the district court issued a judgment of contempt based on the unopposed motion[3] for judgment and the record in the case. The court noted that the Kirks had been paying various bills and making progress in retiring other debts and that they had not attempted to sell or mortgage any real or personal property despite having $45,000 of equity in such property. In addition, the court found that the Kirks had failed to negotiate a more favorable payment plan in good faith and had failed to live up to any of their promises regarding payment.

Because the Kirks did not establish an involuntary inability to comply with the consent order, the court found them in civil contempt of the consent order. The contempt judgment further ordered:

that the Defendants purge themselves of contempt by submitting to the Court a sworn statement which specifically lists all of the Defendants' current assets in order to assist further enforcement of the Consent Order;

... that the Defendants deposit with the escrow agent the existing monetary ar-

---

**3.** Counsel for the Kirks has explained that he had not yet submitted his response to the motion although it was ready on the day when the contempt judgment was issued, but that he attached it to his motion for a new trial and/or to vacate judgment of contempt which was filed two days after the contempt judgment.

rearage of Twenty Thousand Nine Hundred and Sixty Dollars ($20,960) as established by the Consent Order; and

... that the Court hereby assesses a fine of One Hundred Dollars ($100) per day for each day the Defendants fail to purge themselves of contempt except that the fine shall be cancelled if the Defendants have purged themselves of contempt within seven (7) days of the entry of the judgment of contempt; said fine shall be increased to Four Hundred Dollars ($400) per Defendant if compliance has not been achieved within fourteen (14) days of the entry of the Judgment of Contempt.

The Kirks maintained in their post-judgment motion for new trial and/or motion to vacate judgment of contempt that the court's findings were based on statements of the Secretary which were untrue. As noted previously, *see supra* note 3, the Kirks' motion was accompanied by their response to the Secretary's post-hearing memorandum. In it, they contested the Secretary's allegation that they had paid only $40 to the escrow agent, and they attached a letter from the escrow agent stating that he had received $270 as of May 10, 1984. They also pointed out that several banks had liens on virtually everything they owned with foreclosure impending if they did not make regular payments on the bank notes. They argued that they cannot borrow any money from a bank because of their existing debts and the liens on their property above its market value. As to their interaction with the Secretary, they claimed the following facts to represent the true situation: "It was only after the Court suggested or directed that the parties negotiate some payments that could be made

by Defendants that the Secretary ever manifested the slightest intention to ever discuss the possibility of payments. After working with H.U.D. for about two years on this matter, defendants [sic] attorney is certain that H.U.D. would have literally laughed in our face at such a proposal prior to the August 19, 1983 contempt hearing." Finally,[4] they pointed out that the lien on their homestead would be improper under Texas law, citing Tex. Const. art. XVI, § 50.

The district court denied the Kirks' motion for new trial and/or motion to vacate judgment of contempt. Noting that the Kirks' response was late, but considering its substance, the district court concluded that the Kirks "still failed to present any evidence sufficient to establish an involuntary inability to comply with the consent order, or explain their failure to negotiate with the Secretary in good faith and comply with agreements previously negotiated with the Secretary."

The fines and enforcement of the contempt judgment have been stayed pending this appeal.

## II. ANALYSIS

### A. Imprisonment for Debt

■ The threshold question in this case is whether the contempt judgment violated the prohibition against imprisonment for debt of 28 U.S.C. § 2007(a) and Tex. Const. art. I, § 18. The federal statute is to be read in conjunction with the law of the state, *i.e.*, section 2007(a) prohibits imprisonment for debt based on any process issued from a federal court in Texas to the extent that Texas law prohibits imprisonment for debt.[5] In determining whether

---

4. The Kirks additionally argued that the contempt judgment was improper under 28 U.S.C. § 2007(a) and Tex.Const. art. I, § 18. As discussed in part II *infra*, our analysis will be limited to this argument which we find to be dispositive.

5. The relevant provision of the federal statute provides that:

A person shall not be imprisoned for debt on a writ of execution or other process issued

from a court of the United States in any State wherein imprisonment for debt has been abolished. All modifications, conditions, and restrictions upon such imprisonment provided by State law shall apply to any writ of execution or process issued from a court of the United States in accordance with the procedure applicable in such State.

28 U.S.C. § 2007(a).

The relevant provision of the Texas Constitution provides that: "No person shall ever be

contempt sanctions were properly used by the district court to enforce the consent order, we will first discuss whether the consent order was a "money judgment" or debt under federal law, then whether the use of contempt sanctions constituted imprisonment under federal law, and finally whether Texas law permits contempt sanctions for noncompliance with the consent order.[6]

### 1. *Money Judgment/Debt*

For section 2007(a) to apply in this case, the consent order must be a "money judgment" or debt.[7] The Secretary contends that imprisonment for "failure to make court-ordered payments" is not imprisonment for debt within the meaning of section 2007(a). The two cases cited in support of this argument do not resolve the status of the present consent order. *See In re Cordova Gonzalez,* 726 F.2d 16, 21 n. 1 (1st Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984); *Usery v. Fisher,* 565 F.2d 137, 139 (10th Cir.1977). In *Cordova Gonzalez,* the alleged debt was actually a fine imposed as a sanction on an attorney who withdrew shortly before trial. The fine was based on the costs incurred by opposing counsel in preparing for trial and was imposed under the inherent power of a court to "assess expenses against counsel who wilfully abuse judicial processes." *Id.* at 20 (citation omitted). In *Fisher,* the Tenth Circuit found the prohibitions against imprisonment for debt inapplicable because the consent order was equitable in nature rather than being a money judgment. *Id.* at 139.

Although the consent order in *Fisher* bears some resemblance to that in the present case, the court's construction of the *Fisher* order as equitable appears to have been based on its implementation of the requirements of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* Specifically, the order in *Fisher* enjoined Fisher from further violations of the Act and restrained him "from continuing to withhold the sum of $2,500 in unpaid minimum wages and overtime compensation due his employees." *Id.* at 138. The order also provided that the amounts due be paid to the Secretary of Labor in monthly installments for distribution to the employees by the Secretary. *Id.* After Fisher ceased making the monthly payments, the Secretary instituted civil contempt proceedings against him. The district court denied the Secretary's petition, finding the consent order to be a "money judgment," and therefore under section 2007(a) and Colo. Const. art. II, § 12, not enforceable by a contempt judgment.

On appeal, the Tenth Circuit disagreed with the district court's analysis to the extent that it found the consent order not to be a "money judgment" but rather to be equitable in nature. *Id.* The court focused on the terms of the order enjoining Fisher from "continuing to withhold" the money due his employees, citing a Fifth Circuit case for the proposition that the purpose of an injunction under the Fair Labor Standards Act "to restrain the withholding of wages due *is not to collect a debt* ... but [is] to correct a continuing offense against the public interest." *Id.* (quoting *Wirtz v.*

[W]hether confinement to compel payment amounts to "imprisonment for debt" is a matter of federal law. Only if the obligations are "debts" and the confinement "imprisonment for debt" within the meaning of 28 U.S.C. § 2007(a) do we turn to state law. *Id.* at 1171 (footnote omitted).

**7.** While the statutory provision refers only to "debt," cases construing the statute have typically referred to the debt as a "money judgment."

imprisoned for debt." Tex.Const. art. I, § 18. The commentary to this section is that "[a]ll causes of actions become debts when they are placed in the form of judgments, but 'there are many instances in the proceedings of the courts where the performance of an act may be enforced by imprisonment and would not come within the prohibition of the Constitution although it might involve the payment of money.'" Tex.Const. art. I, § 18, interp. commentary (Vernon 1984).

**6.** This analysis is consistent with that in *S.E.C. v. Diversified Growth Corp.,* 595 F.Supp. 1159 (D.D.C.1984), wherein the court observed that:

*Jones,* 340 F.2d 901, 904 (5th Cir.1965)) (emphasis added). *Fisher* also cites a Seventh Circuit case for the proposition that the payment of money for past violations of the Act is not a "money judgment" but a judgment "designed to ensure compliance with the Act." *Id.* (citing *Fleming v. Warshawsky & Co.,* 123 F.2d 622 (7th Cir. 1941)). We distinguish the *Fisher* decision as restricted to the enforcement of the Fair Labor Standards Act.

Thus, neither *Cordova Gonzalez* nor *Fisher* provides a basis for our finding that the consent order in the present case requiring the payment of money not to be a "money judgment" or debt within the meaning of section 2007(a). Similar to the Fair Labor Standards Act violation involved in *Fisher* is a recent case involving the Employee Retirement Security Act of 1974, 29 U.S.C. §§ 1001–1381, in which the court relied on *Fisher* and the other Fair Labor Standards Act cases cited therein to justify the imposition of a contempt judgment. *See Robbins v. Labor Transportation Corp.,* 599 F.Supp. 705, 708 (N.D.Ill. 1984). The court in *Robbins* noted the similarity as follows: "In either case, what is at stake is the economic well-being of ... employees who are entitled to minimum wages *and* to the pension and health benefits that have been promised them." *Id.* (emphasis in original). In holding that contempt proceedings would be proper, the court further referred to "the importance of the public policy embodied in the Employment Retirement Income Security Program," *i.e.,* "the continued well-being and security of employees ... [with] appropriate remedies, sanctions, and ready access to the federal courts." *Id. Robbins,* too, would not provide a basis for our finding that the consent order in the present case is not a "money judgment" for the purposes of section 2007(a).

■ Thus, we find that the consent order in the present case is a money judgment and as such is subject to the prohibition against imprisonment for debt of section 2007(a). It does not fit any of the exceptions previously carved out by the federal courts concerning judgments involving money that are not subject to section 2007(a). Further, no compelling public policy argument has been advanced by the Secretary nor do we *sua sponte* find the present money judgment to be exempt from the section 2007(a) prohibition.

### 2. *Imprisonment*

■ The Secretary argues that the Kirks have not been imprisoned or threatened with imprisonment. We find, however, that the contempt judgment in this case carried with it an imminent threat of imprisonment for failure to comply with its terms. We note that nonpayment of civil contempt fines that have not been imposed for a failure to pay a "money judgment" but for refusal to obey a court order may lead to imprisonment which would not be prohibited under section 2007(a). *See Chapman v. United States,* 139 F.2d 327, 331 (8th Cir.1943); *Diversified Growth Corp.,* 595 F.Supp. at 1171. Accordingly, the consent order, being a money judgment, is not properly enforceable by a contempt judgment if not otherwise exempted from the prohibition against imprisonment for debt under Texas law. *Cf. Fisher,* 565 F.2d at 139 (district court held that any adjudication of civil contempt inapplicable to a money judgment because of the implicit power to punish by imprisonment; issue not reached on appeal). Finding the contempt sanctions for noncompliance with the terms of the consent order to be governed by the prohibition against imprisonment for debt of section 2007(a), we turn to Texas state law to determine whether the order may properly be enforced by civil contempt sanctions.

### 3. *Texas Law*

■ The Secretary contends that under Texas law imprisonment is an appropriate contempt sanction for failing to make payments in accordance with a court order unless the contemner demonstrates inability to pay. The two cases cited in support of this argument, *see Ex parte Dustman,* 538 S.W.2d 409 (Tex.1976); *Ex parte Ray-*

*mer,* 644 S.W.2d 889 (Tex.App.—Amarillo 1982, no writ), exemplify a line of cases exempting money judgments in domestic relations cases from the full prohibition against imprisonment for debt in Tex. Const. art. I, § 18. *See supra* note 5.

In *Raymer,* the court held that a criminal contempt penalty was valid if the contemner failed to carry the burden of proof of establishing that he was unable to make each child support payment as it came due. *Id.* at 890. It held further that to invalidate a civil contempt judgment, the contemner must "establish impossibility of performance at the time of commitment to jail." *Id.* The contemner must present not only conclusive proof that "he lacks the financial resources to pay the delinquency, but also that he knows of no source from which the sum might be obtained." *Id.* (citation omitted). The latter may be shown by proof that the contemner "(1) does not have property that can be sold or mortgaged in order to obtain the necessary amount; (2) has unsuccessfully attempted to borrow the necessary amount from financial institutions; and (3) knows of no other source, including relatives, from which the necessary amount can be obtained." *Id.* at 890–91 (citation omitted). In *Dustman,* the Texas Supreme Court ordered the contemner discharged in view of his established inability to pay the arrearage due in child support payments ordered in his divorce judgment.

Numerous other Texas cases have both permitted and imposed certain restrictions on imprisonment as a civil sanction in domestic relations cases. *See, e.g., Ex parte Preston,* 162 Tex. 379, 347 S.W.2d 938, 942 (1961) (quoting *Decker v. Decker,* 52 Wash.2d 456, 326 P.2d 332, 333 (1958), for the proposition that "[p]roblems of domestic relations involving alimony, support payments, property settlements, together with court orders in connection therewith, do not normally fall into the debtor-creditor category."); *Ex parte Jackson,* 590 S.W.2d 775, 776 (Tex.Civ.App.—El Paso 1979, no writ) (holding that a divorce judgment ordering a husband to pay $5000 in past community debts could not be enforced by a contempt judgment because it concerned money to be earned in the future).

Were we to find that the Texas law exemption from the prohibition against imprisonment for debt for domestic relations cases, *see* Tex. Const. art. I, § 18, interp. commentary (Vernon 1984), *supra* note 5, applies to this case, *Raymer* would dictate that the district court hold an evidentiary hearing prior to issuing a contempt order to provide an opportunity for the Kirks to demonstrate their inability to pay at that time. However, we find that the Texas domestic relations cases are exceptions to the general prohibition against imprisonment for debt, and therefore are inapplicable to the present case. *See also infra* part B.

Accordingly, the civil contempt judgment imposed by the district court, carrying with it the threat of imprisonment, is prohibited by section 2007(a) and Tex.Const. art. I, § 18, to enforce the consent order, and must be vacated.

### B. Other Issues

In view of our finding that the contempt judgment violates the prohibition against imprisonment for debt of section 2007(a) and of the Texas Constitution, we do not reach the following issues also raised on appeal: (1) whether the district court erred in finding the appellants financially able to comply with the consent order; (2) whether the district court erred in denying appellants an evidentiary hearing prior to issuing the contempt order; (3) whether the fines imposed by the contempt order were excessive; (4) whether the contempt order was void for vagueness; and (5) whether the district court erred in not requiring the Secretary to attempt to collect the payments due using less harsh remedies prior to commencing contempt proceedings.

### III. CONCLUSION

For the reasons given above, the contempt judgment is hereby VACATED and the case REMANDED to the district court for that purpose.