**Samuel R. PIERCE, Jr., Secretary of Housing and Urban Development, Plaintiff-Appellee,**

v.

**VISION INVESTMENTS, INC., Vision Village, Inc., Lakin D. Kirk, and Nancy J. Kirk, Defendants-Appellants.**

**No. 84–1642.**

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1986.

---

Nancy J. Kirk, pro se.

Wayne Dickey, Waco, Tex., for defendants-appellants.

Mark H. Gallant, Mark B. Stern, Civ. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before WISDOM, JERRE S. WILLIAMS, and ROBERT MADDEN HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge.

Plaintiff-appellee Secretary of Housing and Urban Development (Secretary) seeks a rehearing, with a suggestion for rehearing en banc, of our original panel opinion in this case, *Pierce v. Vision Investments, Inc.*, 765 F.2d 539 (5th Cir.1985). The Secretary contends that we erred in holding that civil contempt was not an available remedy for violation of a consent order entered in a suit brought under the Interstate Land Sales Full Disclosure Act. We find the argument of the Secretary persuasive; therefore, we grant panel rehearing, vacate our previous opinion, and submit the following opinion. The grant of panel rehearing moots the suggestion for rehearing en banc.

In this appeal from a civil contempt judgment for failure to comply with the payment terms of a consent order entered to enforce the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701–1720, the contemners urge us to apply the prohibition against imprisonment for debt of 28 U.S.C. § 2007(a) and Tex.Const. art. I, § 18. Finding that the district court's use of contempt sanctions to enforce the payment terms of the consent order does not fall within the scope of the section 2007(a) prohibition and that Texas law does not prohibit the use of contempt in this case, we hold that a contempt judgment is available to enforce the Interstate Land Sales Full Disclosure Act and remand the case to the district court for a hearing to determine the contemner's ability to comply with the consent order.

## I. FACTS AND PROCEDURAL HISTORY

The Secretary brought a suit to enforce the Interstate Land Sales Full Disclosure

Act (the Act) against Lakin Kirk and his wife, Nancy Kirk, who through family corporations [1] had allegedly violated the Act in developing Club Park subdivision in Hill County, Texas. The suit was settled; the consent order permanently enjoined the Kirks from engaging in activities considered unlawful by the Secretary and required monies to be paid by the Kirks to Club Park purchasers who had lost their lots upon foreclosure. The consent order also required that within fifteen days the Kirks appoint an independent escrow agent to be approved by the Secretary, and that within ninety days they file an affidavit with the Secretary listing the purchasers holding title to or due a conveyance of one or more Club Park lot(s) prior to the foreclosure. Finally, the consent order provid-ed for the following schedule of payments to be made to the escrow agent (who in turn would distribute the monies to the Club Park lot purchasers): $10,000 to be paid by April 28, 1983; $11,000 to be paid by April 28, 1984; and $12,000 to be paid by April 28, 1985.

On February 4, 1983, the Secretary filed a motion for judgment of contempt based on the Kirks' failure to appoint an escrow agent and to file the list of Club Park lot purchasers. Subsequently, the Secretary acknowledged receipt of the list and of the name of an acceptable escrow agent, but sought the contempt judgment for failure to pay the $10,000 due on April 28, 1983.

At a hearing on August 19, 1983, testimony was introduced concerning the Kirks' inability to make the payment due.[2] The

1. The two corporations, also defendants in the suit, are Vision Investments, Inc., and Vision Villages, Inc. Lakin Kirk was the president of both corporations and Nancy Kirk was the vice-president and secretary of both corporations.

2. The testimony of Lakin Kirk concerning his inability to make the $10,000 payment included the following:

Q. Mr. Kirk, I need to ask you about this payment that became due April 28, 1982 [sic]. Did you have the money to pay that payment at that time?
A. No.
Q. And have you thought about taking bankruptcy?
A. Oh, yeah, think about that.
Q. If you would, go through some of the debts that you owe right now as a result of this foreclosure, banks, etc., the debts you owe right now.
A. Well, I have two judgments from two insurance companies that were involved with me at that particular time, and I believe that they amount to about 25 thousand dollars in the Dallas area. As a result of this, I owe to two banks a total of probably 65 thousand dollars from old debts left over from that era.
I have another 15 thousand to another bank that loaned me money to buy a house. And then I would imagine five to seven thousand dollars of accounts payable is left. These are corporate debts. I figure they are my responsibility.
Q. These are current debts, right? They are current right now. They are due right now?
A. Well, they are running—the accounts payable are way behind, but they are the core of what is left. And the other is within 30 days of being current.
      *       *       *       *       *       *

Q. Do you have any property that does not have a loan on it?
A. No.
Q. Other than just, you know, the stuff around your house like silverware or plates or stuff? I'm talking about the usual things like cars, trucks, houses, any land.
A. No, I have no assets without a lien.
      *       *       *       *       *       *
Q. What about relatives? Have you got any relatives you can borrow this money from, this ten thousand dollars?
A. No.
Q. Will these banks loan you this ten thousand dollars?
A. No, not for this purpose.
Q. Why?
A. I recently talked to three of these four banks that I was involved with, and the one says they would lend me money to get back into business, but that's all.
Q. When did you talk about getting back into business? What are you going to be doing? Are you managing a business, or what?
A. Well, right now we are running—I'm running a drape route, but that's going to grow into a drape business that I hope to make quite large, cleaning drapes, commercial drapes only.
Q. Do you do the cleaning, yourself?
A. I do the cleaning, myself, right now, but we intend also to hire other people to grow.
      *       *       *       *       *       *
Q. How many hours a day do you work cleaning these drapes?
A. Well, we work 12 hours in our business a day, at least.
Q. What time do you generally get home from work?
A. Nancy and I don't get home—that doesn't really matter, does it?

testimony also included the fact that from the sale of a dry cleaning business the Kirks presently had $20,000 in a bank account. The unavailability of this money was, however, explained as follows:

Well, I have a note there at that bank, and the understanding that we have is that the proceeds of that money can go towards another business, which I'm in the process of setting up just a drape-cleaning business, and if anything is left, that must go towards my note [of $60,-000]. He loaned the money to buy the dry cleaners to begin with.

At the conclusion of the hearing, the Secretary's attorney suggested that the Kirks "be ordered to submit an affidavit ... listing with specificity all their assets and location and value of those assets" in order that the court could order liquidation of specific assets to satisfy the amount due under the consent order.

The court, observing that "you can't get blood out of a turnip," suggested to the government that it "try to initiate some sort of a payment schedule based upon the problems that the defendants have had to try to insure payment in a reasonable manner when and if these defendants get back on their feet again." The court reiterated its belief that the Kirks could not immediately pay the full amount due and declined to issue a contempt judgment, explaining its decision as follows:

It appears to me this defendant or these defendants are in dire financial straits. I don't like to order defendants to do things which are beyond their capacity to do reasonably so, and I'm just not willing to do that. I have been satisfied at this point that these defendants do not have the ability to pay ten thousand dollars today.

Q. Well, it does matter in regard to whether or not you are working hard trying to make this ten thousand dollars.
A. Well, I'm working hard.
  *  *  *  *  *  *
Q. So all the funds that you have testified to here today, the lack of them, goes for Mrs. Kirk, also?
A. Uh-huh.

The question is whether you can work with Mr. Dickey and with his clients to perhaps revise this consent order based upon them getting back on their feet again. It's not going to do the government any good or the creditors, the people who might have been defrauded, any good for this court to hold these defendants in contempt requiring them to do something which they can not do.

But I think with reasonable minds working together and allowing these individuals an opportunity to get back on their feet again, if indeed they can, that perhaps the requirements originally envisioned within the consent decree be met.

The court then required the Kirks to submit sworn statements of current assets, taking the motion of contempt under advisement "until the parties notify the court as to the availability of assets and any revised payment schedule."

On May 14, 1984, the Secretary filed a post-hearing memorandum in support of the contempt motion. Without holding a new hearing, the district court issued a judgment of contempt based on the unopposed motion [3] for judgment and the record in the case. The court noted that the Kirks had been paying various bills and making progress in retiring other debts and that they had not attempted to sell or mortgage any real or personal property despite having $45,000 of equity in such property. In addition, the court found that the Kirks had failed to negotiate a more favorable payment plan in good faith and had failed to live up to any of their promises regarding payment.

Because the Kirks did not establish an involuntary inability to comply with the consent order, the court found them in civil contempt of the consent order. The contempt judgment further ordered:

3. Counsel for the Kirks has explained that he had not yet submitted his response to the motion although it was ready on the day when the contempt judgment was issued, but that he attached it to his motion for a new trial and/or to vacate judgment of contempt which was filed two days after the contempt judgment.

that the Defendants purge themselves of contempt by submitting to the Court a sworn statement which specifically lists all of the Defendants' current assets in order to assist further enforcement of the Consent Order;

.... that the Defendants deposit with the escrow agent the existing monetary arrearage of Twenty Thousand Nine Hundred and Sixty Dollars ($20,960) as established by the Consent Order; and

... that the Court hereby assesses a fine of One Hundred Dollars ($100) per day for each day the Defendants fail to purge themselves of contempt except that the fine shall be cancelled if the Defendants have purged themselves of contempt within seven (7) days of the entry of the judgment of contempt; said fine shall be increased to Four Hundred Dollars ($400) per Defendant if compliance has not been achieved within fourteen (14) days of the entry of the Judgment of Contempt.

The Kirks maintained in their post-judgment motion for new trial and/or motion to vacate judgment of contempt that the court's findings were based on statements of the Secretary which were untrue. As noted previously, *see supra* note 3, the Kirks' motion was accompanied by their response to the Secretary's post-hearing memorandum. In it, they contested the Secretary's allegation that they had paid only $40 to the escrow agent, and they attached a letter from the escrow agent stating that he had received $270 as of May 10, 1984. They also pointed out that several banks had liens on virtually everything they owned with foreclosure impending if they did not make regular payments on the bank notes. They argued that they cannot borrow any money from a bank because of their existing debts and the liens on their property above its market value. As to their interaction with the Secretary, they claimed the following facts to represent the

true situation: "It was only after the Court suggested or directed that the parties negotiate some payments that could be made by Defendants that the Secretary ever manifested the slightest intention to ever discuss the possibility of payments. After working with H.U.D. for about two years on this matter, defendants [sic] attorney is certain that H.U.D. would have literally laughed in our face at such a proposal prior to the August 19, 1983 contempt hearing." The Kirks additionally argued that the contempt judgment was improper under 28 U.S.C. § 2007(a) and Tex.Const. art. I, § 18. Finally, they pointed out that the lien on their homestead would be improper under Texas law, citing Tex.Const. art. XVI, § 50.

The district court denied the Kirks' motion for new trial and/or motion to vacate judgment of contempt. Noting that the Kirks' response was late, but considering its substance, the district court concluded that the Kirks "still failed to present any evidence sufficient to establish an involuntary inability to comply with the consent order, or explain their failure to negotiate with the Secretary in good faith and comply with agreements previously negotiated with the Secretary."

The fines and enforcement of the contempt judgment have been stayed pending this appeal.

## II. ANALYSIS

The threshold question in this case is whether the contempt judgment violated the prohibition against imprisonment for debt of 28 U.S.C. § 2007(a) and Tex.Const. art. I, § 18. The federal statute is to be read in conjunction with the law of the state, *i.e.*, section 2007(a) prohibits imprisonment for debt based on any process issued from a federal court in Texas to the extent that Texas law prohibits imprisonment for debt.[4] In determining whether

4. The relevant provision of the federal statute provides that:

A person shall not be imprisoned for debt on a writ of execution or other process issued from a court of the United States in any State

wherein imprisonment for debt has been abolished. All modifications, conditions, and restrictions upon such imprisonment provided by State law shall apply to any writ of execution or process issued from a court of

contempt sanctions were properly used by the district court to enforce the consent order, we will first discuss whether the consent order was a "money judgment" or "debt" under federal law, and, if not, whether Texas law permits contempt sanctions for noncompliance with the consent order.[5]

### A. *Money Judgment/Debt*

■ For section 2007(a) to apply in this case, the consent order must be a "money judgment" or "debt".[6] The Secretary contends that imprisonment for "failure to make court-ordered payments" is not imprisonment for debt within the meaning of section 2007(a). We conclude that the consent order is not a mere money judgment or debt but rather is an equitable decree and an injunction in the public interest and is therefore properly enforceable by a judgment of contempt. We base our conclusion on analogous cases in the fields of labor and securities law and on the legislative history of the Act.

In *Hodgson v. Hotard*, 436 F.2d 1110 (5th Cir.1971), we analyzed in depth when a judgment compelling payment of money is enforceable by contempt sanctions. In *Hotard* the Secretary of Labor brought suit to require an employer to pay his employees wages due under the terms of the Fair Labor Standards Act (FLSA). The employer refused to pay the wages due under the court's decree, claiming inability to pay. Although the employer failed to substantiate his alleged inability to comply with the court order, the district court refused to hold the defendant in contempt on the basis of its "erroneous assumption that a judgment entered pursuant to section 17 of the Fair Labor Standards Act is merely a mon-

ey judgment, which under Florida law is enforceable only by levy or execution against Hotard's property." *Id.* at 1113. The appellate court observed that section 17, which permitted the Secretary to seek recovery of wrongfully withheld wages, was adopted as a necessary measure to insure compliance with public policy regarding the minimum wage. Quoting its earlier holding in *Wirtz v. Jones*, 340 F.2d 901 (5th Cir.1965), the court stated that "the purpose of the injunction to restrain the withholding of wages due is not to collect a debt owed by an employer to his employee but to correct a continuing offense against the public interest." 436 F.2d at 1113–14 (quoting *Wirtz v. Jones*, 340 F.2d at 904). Noting the Supreme Court's statement in *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 194, 69 S.Ct. 497, 501, 93 L.Ed. 599 (1949), that "[i]f the court is powerless to require the prescribed payments to be made, it has lost the most effective sanction for its decree and a premium has been placed on violations," the court declared:

> By defining its original order as a mere money judgment, the District Court has abdicated its proper role as a protector of national labor policy legislated in the Fair Labor Standards Act.... In so doing, the court threatens to weaken public confidence in the efficacy of this Act, as well as the confidence of those former employees whom Hotard has wronged. We cannot allow such an abuse of judicial discretion.

436 F.2d at 1114–15 (citations omitted).

The Fifth Circuit's reasoning in *Hotard* was adopted by the Tenth Circuit in *Usery*

---

the United States in accordance with the procedure applicable in such State.
28 U.S.C. § 2007(a).
The relevant provision of the Texas Constitution provides that: "No person shall ever be imprisoned for debt." Tex.Const. art. I, § 18.

**5.** This analysis is consistent with that in *S.E.C. v. Diversified Growth Corp.*, 595 F.Supp. 1159 (D.D.C.1984), wherein the court observed that: "[W]hether confinement to compel payment

amounts to 'imprisonment for debt' is a matter of federal law. Only if the obligations are 'debts' and the confinement 'imprisonment for debt' within the meaning of 28 U.S.C. § 2007(a) do we turn to state law." *Id.* at 1171 (footnote omitted).

**6.** While the statutory provision refers only to "debt," cases construing the statute have typically referred to the debt as a "money judgment."

*v. Fisher*, 565 F.2d 137 (10th Cir.1977); the *Fisher* court held that a consent judgment in a FLSA suit requiring payment of unpaid wages was enforceable by contempt and did not violate the prohibition on imprisonment for debt. The court ruled that the consent judgment was "not a money judgment" and was equitable in nature. *Id.* at 139. *See also Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55 (2d Cir.1984) (contempt appropriate in enforcing payment of wages under FLSA); *Donovan v. Mazzola*, 716 F.2d 1226, 1239 & n. 9 (9th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984) (contempt appropriate in enforcing order to pay money under the Employee Retirement Income Security Act (ERISA)). Similarly, in *Robbins v. Labar Transportation Corp.*, 599 F.Supp. 705 (N.D.Ill.1984), the court applied this court's holdings in *Wirtz v. Jones* and *Hodgson v. Hotard* and concluded that an order requiring an employer to satisfy its obligation for past-due contributions to an employee trust fund was enforceable by contempt sanctions without violating the prohibition against imprisonment for debt. The court noted that unlike suits under the FLSA, individual rights under ERISA derive from contracts between employers and employees. However, the court found these distinctions to be of no import: "The assurances of the Employee Retirement Security Income Program would be hollow if the courts could not enforce judgments against employers...." *Id.* at 708.

The reasoning of these cases leads us to the conclusion that the consent order in this case is enforceable by contempt sanctions. Like the FLSA and ERISA, the Interstate Land Sales Full Disclosure Act protects important public interests. Civil contempt is a necessary remedy for the courts to protect these public interests. The Report of the Senate Committee on Banking and Currency accompanying the senate bill, S. 3497, 90th Cong., 2d Sess.

(1968), that was later enacted with minor modifications declared:

> The necessity for this legislation was made very apparent during hearings held by the Special Committee on Aging in 1964 and by the Securities Subcommittee of this committee in 1966 and 1967.
>
> Evidence of abuse in the sale of undeveloped land by promoters was presented at the hearings. For example, many people, including our Nation's senior citizens, have purchased property in response to false and misleading promises regarding the nature of the land and the type of community in which it would be located. As a result, they have suffered financial losses, which in many instances amounted to their entire life savings....
>
> \*    \*    \*    \*    \*    \*
>
> ... [T]he public and the responsible developers suffer from those developers who do not disclose all the material facts to the prospective purchaser. The proposal of the committee would authorize the Secretary of Housing and Urban Development to require such disclosure. By so doing, the public is protected as in the responsible developer.

S.Rep. No. 1123, 90th Cong., 2d Sess. 109 (1968).

A suit brought by the Secretary under the Interstate Land Sales Full Disclosure Act to restrain violations of the statute and compel disgorgement and restitution is designed to vindicate a public right whose importance has been recognized by Congress. Such a suit is clearly equitable in nature. The complaint in this case seeks injunctive relief including disgorgement. The consent order enjoins future violations and orders "partial disgorgement and restitution." The courts have repeatedly held this remedy to be equitable in the context of Securities Act cases where the courts have directly considered whether such orders are money judgments or equitable decrees.[7] Judge Friendly observed in *SEC v.*

---

**7.** Reference to Securities Act cases is particularly appropriate as the Interstate Land Sales Full Disclosure Act is patterned on the Securities Act

of 1933. *Flint Ridge Development Co. v. Scenic Rivers Association*, 426 U.S. 776, 778, 96 S.Ct. 2430, 2433, 49 L.Ed.2d 205 (1976).

*Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 96 (2d Cir.1978):

> While from the standpoint of a defendant in an action for violation of the securities laws there may be no great difference between paying money in response to a private suit for damages and in a SEC action for injunction and disgorgement wherein the SEC makes the proceeds of disgorgement available to injured parties, the suit by the SEC is decidedly more analogous to the traditional jurisdiction of equity to award restitution.

The court in *SEC v. Asset Management Corp.,* 456 F.Supp. 998, 1000 (S.D.Ind. 1978), applied this holding and further noted a second "critical [distinction] between actions brought by the S.E.C. and private actions." The court emphasized that "[t]he entire purpose and thrust of a S.E.C. enforcement action is to expeditiously safeguard the public interest by enjoining securities violations. The claims asserted in such an action stem from, and are colored by, the intense public interest in S.E.C. enforcement of these laws." *Accord SEC v. Associated Minerals, Inc.,* 75 F.R.D. 724, 726 (E.D.Mich.1977) ("[t]he Commission's prayer for disgorgement of investor funds seeks a form of restitution which has historically been allowed only in equity").

Because the court's order in the present case is an equitable decree designed to protect the public and to permit effective enforcement of the Interstate Land Sales Full Disclosure Act, a judgment of contempt designed to enforce that order is entirely appropriate. As our court recently emphasized in discussing contempt sanctions imposed to enforce an injunction in securities fraud litigation: "Courts possess the inherent authority to enforce their own injunctive decrees.... 'Courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender.'"

*Waffenschmidt v. Mackay,* 763 F.2d 711, 716 (5th Cir.1985) (citations omitted). Thus, we conclude that a consent order entered in a case brought by the Secretary of Housing and Urban Development under the Interstate Land Sales Full Disclosure Act is enforceable by civil contempt.

**B.  *Texas Law***

■ The Secretary contends, and we agree, that under Texas law, and the facts of this case, imprisonment is an appropriate contempt sanction for failing to make payments in accordance with a court order unless the contemner demonstrates inability to pay. While the Texas Constitution prohibits imprisonment for debt, nothing in the existing Texas jurisprudence indicates that a Texas court would find that the court order in this case was a mere debt. We believe that the Texas courts would follow our reasoning in the preceding section of this opinion and hold that an order entered in a case brought by the Secretary under the Interstate Land Sales Full Disclosure Act is an injunction in the public interest and is enforceable by contempt. The Interpretive Commentary to article I, section 18, of the Texas Constitution recognizes that:

> All causes of actions become debts when they are placed in the form of judgments, but "there are many instances in the proceedings of the courts where the performance of an act may be enforced by imprisonment and would not come within the prohibition of the Constitution although it might involve the payment of money."

Tex.Const. art I, § 18, interpretive commentary (quoting *Ex parte Davis,* 101 Tex. 607, 111 S.W. 394, 396 (1908)).

Texas courts have repeatedly held that civil contempt is available when a spouse who is able to pay child support fails to pay the child support due. *See, e.g., Ex parte Dustman,* 538 S.W.2d 409 (Tex.1976), *Ex parte Raymer,* 644 S.W.2d 889 (Tex.App.— Amarillo 1982, no writ). The Texas Su-

preme Court has also held that imprisonment for failure to pay over a portion of retirement benefits to a spouse as ordered in a consent decree entered in a divorce case is not imprisonment for debt. *Ex parte Gorena*, 595 S.W.2d 841 (Tex.1979). The court reasoned that "the husband was not being required to pay a debt to his former wife but was, instead, being required to surrender to her property that already belonged to her by virtue of the divorce decree." *Id.* at 846. We believe that the court's reasoning also applies to the instant case. The Kirks are being required to surrender to the escrow agent the property that already belonged to the land purchasers by virtue of the consent order. We therefore hold that the Texas Constitution does not prohibit the use of contempt to enforce a court order entered to protect the public under the Interstate Land Sales Full Disclosure Act.

### III. ABILITY TO COMPLY

A contempt order is not proper if the contemner is unable to comply with the order he or she failed to obey. *United States v. Bryan*, 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950); *Ex parte Smyers*, 529 S.W.2d 769, 770 (Tex.1975). In light of the amount of time that has elapsed since the appellants were held in contempt, we vacate the contempt judgment and remand to the district court for a hearing as to whether the Kirks are able to comply with the consent order.

**VACATED AND REMANDED.**