United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 23, 2006**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-50290

AF-CAP INC,

Plaintiff - Appellant,

v.

THE REPUBLIC OF CONGO,

Defendant,

CMS NOMECO CONGO INC; THE NUEVO CONGO CO; NUEVO CONGO LTD,

Garnishees - Appellees.

05-50782
cons. w/ 05-51168

AF-CAP INC,

Plaintiff - Appellee,

v.

THE REPUBLIC OF CONGO,

Defendant -Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before DEMOSS, BENAVIDES, and PRADO, Circuit Judges.

BENAVIDES, Circuit Judge:

This appeal concerns an ongoing battle by Af-Cap, Inc. to receive payment from the Republic of Congo on an outstanding debt. At issue are (1) the district court's dissolution of garnishment writs that would have allowed Af-Cap to garnish royalties owed to the Congo; (2) a turnover order that requires the Congo to receive monetary payment (as opposed to in kind payment) of the royalties and requires its debtors to pay the royalties into the court registry; and (3) a contempt order against the Congo for failing to comply with the turnover order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1984, Equator Bank Limited, Af-Cap's predecessor-in-interest, loaned the Congo funds for building a highway.[1] The following year, the Congo defaulted on the loan. More than ten years later, Connecticut Bank of Commerce ("CBC"), an assignee of Equator Bank, obtained a judgment against the Congo in England. The Congo did not make the payments required by the judgment and, as a consequence, CBC proceeded to enforce the judgment in the United States. In 2000, a New York state court entered a money judgment against the Congo in the amount of $13,628,340 plus interest. Subsequently, the New York court entered an order permitting attachment and execution against the assets of the Congo

---

[1] In the loan agreement, the Congo agreed that any suit arising out of the loan could be brought in England or New York.

in satisfaction of the judgment.

In 2001, CBC registered the New York judgment in a Texas state court and simultaneously filed a garnishment action. CBC alleged that CMS Nomeco Congo, Inc., The Nuevo Congo Company, and Nuevo Congo Ltd. (the "CMS Companies"), among others, owed royalties and taxes to the Congo and sought to garnish those obligations to satisfy the judgment. The CMS Companies own working interests in a convention (the "Convention") that governs oil production in Congolese waters. Under the Convention, the interest owners pay the Congo royalties, which accrue when oil is taken from Congolese territory. The Congo chooses the method of payment for these royalties, either cash or "in kind" oil. Since 1999, the Congo has opted to receive 100 percent of its payments "in kind." The state court, *ex parte*, issued writs of garnishment.

The Congo and the CMS Companies removed the action to the United States District Court for the Western District of Texas. In an order dated March 16, 2001, the district court held that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 (2000), prohibited garnishment of the in kind royalties and tax obligations. This Court vacated that decision, recognizing that the property at issue could fall within an exception to FSIA if the property was used by the Congo in conjunction with commercial activity in the United States. *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002). The case was remanded for

further factual development with regard to whether the property was used for "commercial activity."[2]

On remand, the district court found that the Congo did not use its royalties and tax obligations for commercial activity. In doing so, the court dissolved the writs of garnishment against the CMS Companies. On appeal, this Court vacated the district court's decision, holding that the obligations at issue had been used for a "commercial activity" because the Congo used some of the obligations to settle a lawsuit with the National Union Fire Insurance Company ("NUFI"). *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, *amended on rehearing*, 389 F.3d 503 (5th Cir. 2004) (hereinafter "*Af-Cap II*"). It also found that the situs of the obligations was the United States. *Id.* at 373. This Court again remanded, this time instructing the district court to determine which obligations had been used to pay the NUFI debt. Only those obligations would fall within the "commercial activity" exception. *Id.*

Following the remand, the district court denied a motion to reinstate the original writs of garnishment[3] and, instead, issued

_____

[2]By this time, Af-Cap had acquired the debt at issue. It is the sixth owner of the debt.

[3]This Court denied a petition for writ of mandamus on this issue. *See In re Af-Cap Inc.*, No. 04-51357, slip. op. at 2 (5th Cir. Dec. 20, 2004) ("We have every confidence in the district court's ability to properly understand and apply our mandate against the backdrop of the troublesome complexities presented in the garnishment proceedings.").

4

new writs. Shortly thereafter, however, the district court dissolved the new writs. In doing so, the court found that the nonmonetary obligations owed by the CMS Companies were not proper subjects of garnishment under Texas law. In the same decision, the district court held that Texas law allowed a "turnover order," as an alternative method of attachment. The court issued a turnover order on February 22, 2005 that purports to (1) take "possession and control of all future royalty obligations owed to the Congo," (2) "order[] the Congo to turn over such royalty payments into the registry of the Court," and (3) order the Congo "to execute in three originals within three days the attached letter of instruction . . . from the Congo to the parties who pay royalties under the Convention to the Congo revoking prior instructions regarding payment of royalty and instructing that the royalty be paid in cash into the registry of the Court." The royalties were to be applied in favor of Af-Cap until the judgment was satisfied.

In response to the turnover order, the Congolese Ministry of Foreign Affairs and Francophony sent a letter to the district court stating that the Congo would not follow the order because it violated the country's sovereignty. The district court then issued an order directing the clerk of court to execute a letter of instruction, directing the CMS Companies to pay royalty obligations to the court's registry. On July 1, 2005, the district court found the Congo in contempt for failing to comply with the turnover order. Neither the Congo nor the CMS Companies has complied with

5

the orders and the Congo remains in contempt.

The parties timely appealed (1) the order dissolving the writs of garnishment, (2) the turnover order, and (3) the contempt order. We consolidated the three appeals for oral argument and likewise do so now for disposition.

## II. STANDARD OF REVIEW

For the contempt issue, the standard of review is abuse of discretion. *United States v. City of Jackson*, 359 F.3d 727, 731 (5th Cir. 2004). The underlying findings of fact are reviewed for clear error, and the underlying conclusions of law are reviewed *de novo*. *Id.* For all of the remaining issues, the standard of review is *de novo* because the issues raise questions of law. *Randel v. U.S. Dep't of the Navy*, 157 F.3d 392, 395 (5th Cir. 1998). Given that this is a diversity case, this Court must apply the law of Texas. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 79-80 (1938). If the law is unclear, this Court must predict how the Texas Supreme Court would rule. *See Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002). When necessary, the standard of review is discussed in greater detail below.

## III. DISCUSSION

### A. Garnishment Action

The first issue of this consolidated appeal is whether the district court erred by dissolving the writs of garnishment on the ground that Texas law does not allow the garnishment of nonmonetary

6

obligations.

Garnishment actions in Texas are "purely statutory" and courts have no power to extend the benefits of garnishment beyond the relief available under statute. *Beggs v. Fite*, 106 S.W.2d 1039, 1042 (Tex. 1937); *see also* 17 TEX. JUR. 3D *Creditors' Rights and Remedies* § 359 (1998). The Texas garnishment statute, however, does not address the question posed here. *See* TEX. CIV. PRAC. & REM. CODE ANN. ch. 63 (Vernon 1997). It makes no mention of nonmonetary debts. Likewise, no Texas case has specifically considered whether a nonmonetary obligation can be subject to garnishment.

### 1. Texas Does Not Allow Garnishment of Nonmonetary Obligations

Our analysis of this issue is guided by the fact that garnishment has been "long considered [a] harsh remed[y]" by Texas courts. *Varner v. Koons*, 888 S.W.2d 511, 513 (Tex. App.—El Paso 1994, orig. proceeding); *cf. Beggs*, 106 S.W.2d at 1042 (describing garnishees as "strangers" to an action who are subjected to "inconvenience and hazard"). Indeed, Texas case law requires us to "strictly construe" the Texas garnishment statute. *See Varner*, 888 S.W.2d at 513. Given this task of "strict construction," we find that expanding the garnishment statute to cover nonmonetary obligations goes too far. This holding conforms with the principle that courts do not have the equitable power to expand the purely statutory garnishment remedy. *Beggs*, 106 S.W.2d at 1042.

7

Our conclusion is informed by Texas Rule of Civil Procedure 668, which provides that in the event it is determined that "the garnishee is indebted to the defendant *in any amount*, or was so indebted when the writ of garnishment was served, the court shall render judgment for the plaintiff against the garnishee *for the amount so admitted or found to be due* to the defendant from the garnishee." TEX. R. CIV. P. 668 (emphasis added). This rule does not contemplate indebtedness as encompassing obligations other than money. *See Waples-Platter Grocer Co. v. Tex. & Pac. Ry.*, 68 S.W. 265, 266 (Tex. 1902) (holding that an unliquidated claim for breach of contract cannot be garnished); *Willis v. Heath*, 12 S.W. 971, 972 (Tex. 1889) (holding that a negotiable promissory instrument cannot be garnished). Indeed, Texas courts define the term "debt" as a "specified sum of money owing to one person from another." *See Seay v. Hall*, 677 S.W.2d 19, 23 (Tex. 1984), *superseded by statute on other grounds as stated in Palmer v. Coble Wall Trust Co.*, 851 S.W.2d 178, 181 (Tex. 1992). Given that the CMS Companies have a *nonmonetary* obligation to pay in kind oil to the Congo, it cannot be garnished under Texas law.

Af-Cap has failed to point this Court to any authority that proves Texas allows the garnishment of nonmonetary debts. Instead, it mistakenly relies on authority related to "effects." The Texas garnishment statute contemplates garnishment of (1) debts, money owed to a defendant, and (2) effects, tangible property owned by

8

the defendant in possession of the garnishee. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 63.003(a) ("After service of a writ of garnishment, the garnishee may not deliver any effects or pay any debt to the defendant."). The only way the "effects" provision could be applicable here is if a physical object in the possession of the CMS Companies were the subject of this garnishment. That is simply not the case. Indeed, this Court already determined in *Af-Cap II* that the royalty obligation at issue does not have physical characteristics. 383 F.3d at 371 ("[T]his property is intangible in nature."). Therefore, the issue before us concerns a debt, and the "effects" authority relied upon by Af-Cap is inapposite.[4]

To conclude, this case turns on the fact that the obligation at issue is nonmonetary. The CMS Companies, operating under the Convention, do not owe money to the Congo; they owe oil. Af-Cap does not ask this Court to allow it to garnish that oil, assuming it could do so under the FSIA, and instead seeks to be the beneficiary of the nonmonetary obligation. As explained above,

---

[4]Af-Cap relies on *McClung v. Watson*, 165 S.W. 532, 535 (Tex. Civ. App.—Amarillo 1914, no writ), where the court held that a creditor could garnish certain livestock owned by the debtor but in possession of the garnishee. It also relies on *Jamison v. Nat'l Loan Investors, L.P.*, 4 S.W.3d 465, (Tex. App.—Houston [1st Dist.] 1999, pet. denied), where the court described garnishment as "a statutory proceeding whereby the *property*, money, or credits of a debtor in the possession of another are applied to the payment of a debt." *Id.* at 468 (emphasis added). Both of these cases reference "effects," that is physical property owned by the defendant in possession of the garnishee, rather than nonmonetary, intangible obligations.

9

Texas does not allow garnishment of this type of debt. Therefore, the district court did not err in dissolving the writs of garnishment.

### 2. Af-Cap's Other Arguments Fail

Af-Cap also argues that the district court's holding contravenes the law of the case. "[U]nlike res judicata, the law of the case doctrine applies only to issues that were actually decided, rather than all questions in the case that might have been decided, but were not." *Alpha/Omega Ins. Servs. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001). An issue is "actually decided" if the court explicitly decided it or necessarily decided it by implication. *Id.* *Af-Cap II* only addressed whether the obligations at issue were immune from garnishment under FSIA. There is nothing in *Af-Cap II* that interprets state garnishment law. Therefore, the district court correctly questioned whether such an obligation could be garnishable in Texas.

Af-Cap also argues that, as a plaintiff in a garnishment action, it can "step[] into the shoes" of the Congo and elect to receive the royalty payments in cash. *See Rowley v. Lake Area Nat'l Bank*, 976 S.W.2d 715, 719 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). This reasoning, however, ignores the chronology of a garnishment proceeding. The writs at issue must first capture a debt before a garnishor can step into the shoes of

the creditor.  If this were not the rule, would-be garnishors could manipulate assets so that a writ could attach.  Here, the writs failed to capture anything, given that the obligation is nonmonetary.  Therefore, Af-Cap has no authority to request payment in cash.

B.  The Turnover Order

The second issue in this consolidated appeal is whether the district court erred in granting the turnover order that requires the Congo to accept its royalty payments in cash and order its debtors to make those payments to the court registry.

The parties dispute the standard of review for this issue, with the Congo arguing for *de novo* review and Af-Cap arguing for abuse of discretion.  A combination of the two is required.  While the entry of a turnover order is reviewed for an abuse of discretion, a district court necessarily abuses its discretion if its conclusion is based on an erroneous determination of the law. *Maiz v. Virani*, 311 F.3d 334, 338 (5th Cir. 2002).  This Court reviews questions of law *de novo*.  *Randel*, 157 F.3d at 395.  It should be noted, however, that a trial court's issuance of a turnover order, even if predicated on an erroneous conclusion of law, will not be reversed for abuse of discretion if the judgment is sustainable for any reason.  *Maiz*, 311 F.3d at 338.

In Texas, a court may order a judgment debtor "to turn over nonexempt property that is in the debtor's possession or is subject

11

to the debtor's control."  TEX. CIV. PRAC. & REM. CODE ANN. § 31.002 (Vernon 1997).  Such an order can be enforced "by contempt proceedings or by other appropriate means in the event of refusal or disobedience."  *Id.*  The statute is  "the procedural device by which judgment creditors may reach assets of a debtor that are otherwise difficult to attach or levy on by ordinary legal process."  *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 224 (Tex. 1991).

### 1.  The District Court Did Not Have *In Personam* Jurisdiction Over the Congo

The dissolution of the writs of garnishment and creation of the turnover order require this Court to find a new justification for jurisdiction in this case.  In *Af-Cap II*, this Court found jurisdiction based on the fact that the obligations were held by the CMS Companies who were located in the United States, and Texas specifically.  *Af-Cap II*, 383 F.3d at 371–73.  With the turnover order, the district court bypasses the CMS Companies and directly orders the Congo to act.  To find *in personam* jurisdiction, this Court must look to the FSIA, which "provides the sole basis for obtaining *in personam* jurisdiction over a foreign state." *Hashemite Kingdom of Jordan v. Layale Enters., S.A.* (*In re B-727 Aircraft Serial No. 21010*), 272 F.3d 264, 270 (5th Cir. 2001).  In *Af-Cap II*, this Court looked at the FSIA rules for property under § 1610(a); this Court now must look at rules for *in personam*

12

jurisdiction under § 1605(a).  As explained below, the FSIA does not allow *in personam* jurisdiction over the Congo.[5]

Section 1605(a) has two relevant provisions to the present case.  *See* 28 U.S.C. § 1605(a)(1) & (2).  In § 1605(a)(1), personal jurisdiction over a foreign state exists if the state "has waived its immunity either explicitly or by implication."  *Id*. at § 1605(a)(1).  In § 1605(a)(2), personal jurisdiction over a foreign state exists in certain "commercial activity" situations.  *Id*. at § 1605(a)(2).  Beginning with § 1605(a)(2), the "commercial activity" exception is foreclosed by reasoning used in *Af-Cap II*. The *Af-Cap II* Court held that the situs requirement—required under both § 1610 and § 1605—was only possible because the CMS Companies, holding property of the Congo, were located in the United States. Under an analysis of the turnover order, however, the CMS Companies and the property they hold is not considered.  The district court, by dissolving the writs and replacing them with a turnover order, lost the original foothold for jurisdiction.  The "commercial activity" exception does not apply to the Congo.

Turning to § 1605(a)(1), the loan agreement does not explicitly waive immunity to suit in Texas.  (Loan Agreement,

---

[5]Af-Cap suggests that the turnover order should not be a problem because "a virtually identical turnover order" was entered into by the Northern District of Illinois in the NUFI case.  Unlike the present turnover order, however, the Congo consented to the Illinois order.  Therefore, the Congo waived any potential personal jurisdiction argument in the NUFI case.

13

§ 19).  The issue is therefore whether the Congo has implicitly waived immunity to suit in Texas.  This Court has identified three circumstances in which a waiver is ordinarily implied: "(1) a foreign state agrees to arbitration in another country; (2) the foreign state agrees that a contract is governed by the laws of a particular country; (3) the state files a responsive pleading without raising the immunity defense."  *Rodriguez v. Transnave Inc.*, 8 F.3d 284, 287 (5th Cir. 1993) (internal citation omitted). None of these circumstances is present in this case.  First, there is no arbitration agreement.  Second, the loan agreement states that it is to be governed by English law, not United States law. Third, the pleadings with regard to the turnover order have consistently raised an immunity defense.  If this Court wanted to go outside of the three ordinary circumstances, it must still "narrowly construe" the implicit waiver clause of § 1605(a)(1). *Rodriguez*, 8 F.3d at 287 ("[C]ourts rarely find that a nation has waived its sovereign immunity without strong evidence that this is what the foreign state intended.").

In the case at hand, there is no evidence, and certainly no strong evidence, that the Congo implicitly waived immunity to suit in Texas.  Af-Cap has failed to argue, much less show, how *in personam* jurisdiction is appropriate in Texas.  Because the district court erroneously held that the Congo waived its immunity, it abused its discretion.  Therefore, the turnover order is

14

vacated.[6]

## 2.   The Fugitive Disentitlement Doctrine Does Not Require Dismissal of this Appeal

By motion dated May 27, 2005, Af-Cap argued that the Congo's noncompliance with the turnover order should result in the dismissal of this appeal pursuant to the fugitive disentitlement doctrine.  We carried the motion with the merits of the appeal and consider it now.  As explained below, we will not extend the fugitive disentitlement doctrine as contemplated by Af-Cap.

This Court has held that "[a]s a general matter, willful flouting of the judicial system on the part of one seeking appellate redress should not go wholly unrecognized."  *United States v. DeValle*, 894 F.2d 133, 134 (5th Cir. 1990).  The fugitive disentitlement doctrine embodies that principle and limits a party's "access to the judicial system whose authority he evades." *Bagwell v. Dretke*, 376 F.3d 408, 410 (5th Cir. 2004).  The doctrine, however, is a "blunt" instrument that should not be applied without serious forethought.  *Degen v. United States*, 517 U.S. 820, 828 (1996).

In the present case, the policy concerns associated with the doctrine are not served.  The underlying foundation of the doctrine is that it deters "disrespect for the legal process." *Ortega-Rodriguez v. United States*, 507 U.S. 234, 246 (1993).  Sovereignty

[6]We base our holding on the lack of personal jurisdiction and do not address alternative arguments raised by the Congo.

assertions, however, are different than blatant disrespect for the legal process.  As explained above, the Congo correctly believed that under the FSIA the district court lacked *in personam* jurisdiction.  The Congo asserts that its position was not designed to be disrespectful.  As evidence of that fact, it points to the Congolese minister who promptly informed the court that the country would not obey the turnover order because of sovereignty concerns.

In addition, Af-Cap has failed to cite a single case in which the doctrine has been used against a foreign state.[7]  In contrast, at least two cases exist in which foreign instrumentalities have refused to comply with injunctions, yet nonetheless have had their appeals heard.  *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 366–76 (5th Cir. 2003); *Philippine Nat'l Bank v. U.S. Dist. Court for the Dist. of Hawaii* (*In re Philippine Nat'l Bank*), 397 F.3d 768, 772–75 (9th Cir. 2005).  For these reasons, the fugitive disentitlement doctrine does not require dismissal of this appeal.

### 3.   The Law of the Case Does Not Prevent Consideration of Whether the Turnover Order Is Barred by the FSIA

Af-Cap also argues that the law of the case should prevent this Court from considering the Congo's arguments under the FSIA. *Af-Cap II*, however, only considered FSIA compliance with regard to

___

[7]Af-Cap claims that the doctrine was used against a foreign instrumentality in *United States v. Crawford Enterprises, Inc.*, 643 F.Supp. 370, 382 (S.D. Tex. 1986).  A review of that case, however, shows no use of the doctrine.

16

the garnishment of the royalty obligations. The Congo now asks for consideration of the turnover order under the FSIA. As stated above, the turnover order raises unique FSIA issues. *Supra* Part III.B.1. For these reasons, the law of the case does not prohibit this Court from considering the FSIA as it applies to the turnover order.

## C. The Contempt Order

The third issue in this consolidated appeal is whether the district court erred in holding the Congo in contempt.

The district court entered the contempt order on July 1, 2005 after the Congo alerted the court that it would not comply with the turnover order. The court ordered the Congo to pay $10,000 per day into the registry of the district court until it complied with the turnover order. It further stated that if the Congo continued to ignore the turnover order for sixty days, the Congo would be required to send written notice to its business associates in the United States informing them of the amount of outstanding judgment in the case and of the Congo's contempt of court.[8]

---

[8]The United States, as amicus curiae, argues that the district court erred in imposing contempt sanctions against the Congo. In foreign sovereignty cases, such as this one, the government's view is entitled to deference. *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) ("'In such cases [concerning a foreign state's immunity] the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction.'") (quoting *United States v. Lee*, 106 U.S. 196, 209, (1882); see also *Magness v. Russian Fed'n*, 247 F.3d 609, 619 (5th Cir. 2001) (interpreting a legal issue under the FSIA in

### 1. The FSIA Bars the Contempt Order

The FSIA creates the sole method for obtaining jurisdiction over a sovereign state. *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004). It also provides the sole, comprehensive scheme for enforcing judgments against foreign sovereigns in civil litigation. 28 U.S.C. § 1609. The legislative history surrounding the FSIA specifically discusses contempt orders and states that they "may be unenforceable if immunity exists." H.R. Rep. No. 94-1487, at 22 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604.

The contempt order, as written, does not fall within the provisions of the FSIA. A review of the relevant sections, § 1610 and § 1611, shows that they do not present a situation in which the order could stand. Those sections describe the available methods of attachment and execution against property of foreign states. Monetary sanctions are not included. Therefore, in issuing the contempt order, the district court relied on an erroneous conclusion of law. As such, the court abused its discretion, and the contempt order is vacated.

### 2. The FSIA Allows Rights Without Remedies

Because we base our holding on the FSIA, we need not reach other issues raised by the parties.[9] We note, however, an error in

---

light of the government's position expressed in an amicus brief).

[9]The government argues that equitable principles and international practice also require vacating the order.

18

the district court's reasoning so that future courts will not repeat it.  In granting the contempt order, the district court reasoned that Congress must have intended to authorize money sanctions against foreign states when it authorized the issuance of injunctive relief against them.  That reasoning is flawed.  Under the FSIA, a court's power to make an order does not always entail a power of enforcement by sanctions.  *See De Letelier v. Republic of Chile*, 748 F.2d 790, 798–99 (2d Cir. 1984) (rejecting the argument that Congress could not have intended in the FSIA to "create a right without a remedy").

IV.  *FG Hemisphere Associates v. The Republique de Congo*

This Court recently issued an opinion in a related matter, *FG Hemisphere Associates v. Republique du Congo*, _ F.3d _, 2006 WL 1883987 (5th Cir. July 10, 2006) (hereinafter "*FG Hemisphere*"). Like the case at hand, *FG Hemisphere* concerned the appropriateness of garnishment writs targeting debts owed by the CMS Companies to the Congo.  That case focused on the issue of when a district court should determine the situs of the CMS Companies for purposes of the FSIA.[10]  *Id.* at *11.  It held that a court must determine the situs

_____

[10]The situs has great relevance in an FSIA determination because a court can only attach a foreign state's property if that property is in the United States.  28 U.S.C. § 1610(a).  In *Af-Cap II*, this Court found that situs for the present case was in the United States because the debtors (the CMS Companies) and the debt were located in Texas.  *Af-Cap II*, 383 F.3d at 371–73. The CMS Companies argued in *FG Hemisphere*, and now argue here, that the situs has changed because it (and its debts) are now found in Europe.  In July 2004, the Perenco Group, headquartered

19

when it decides whether an FSIA exception to immunity applies. *Id.* After finding that the court had not done the appropriate situs determination at the appropriate time, the *FG Hemisphere* Court reversed the district court's order granting writs of garnishment. *Id.* at *18.

The *FG Hemisphere* opinion was issued after we heard oral argument in this case. The parties filed supplemental briefing specifically addressing how *FG Hemisphere* affects the consolidated appeals now before us. Having reviewed their arguments, we decide not to reach the issues raised by *FG Hemisphere* and instead rely on the authority cited above, *supra* Part III. Applying *FG Hemisphere* would neither change the fact that Texas law does not allow garnishment of nonmonetary obligations[11] nor alleviate the FSIA errors committed by the district court with regard to the turnover and contempt orders. We therefore do not provide alternative holdings based on whether the district court made situs determinations at the appropriate times.

## V. CONCLUSION

To summarize, we hold that the garnishment of nonmonetary obligations is not appropriate under Texas law. Likewise, a

---

in Europe, purchased the CMS Companies.

[11]Under *Af-Cap II*, we have jurisdiction to consider the garnishment writs. 383 F.3d at 373 (holding that the obligations "are not protected by sovereign immunity"). Contrary to the CMS Companies' assertions, nothing requires us to disrupt that holding.

turnover order is not an appropriate remedy in this action because the district court did not have personal jurisdiction over the Congo. Finally, the contempt order is not permissible under the FSIA. For the reasons outlined above, we AFFIRM the district court's decision to dissolve the garnishment writs; VACATE the turnover order; and VACATE the contempt order. We REMAND to the district court for proceedings consistent with this opinion. The motion filed by appellee to dismiss the appeal is denied.