# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
June 5, 2020

Lyle W. Cayce
Clerk

No. 19-20799
c/w No. 20-20235

HEWLETT-PACKARD COMPANY,

　　　　Plaintiff – Appellee,

v.

QUANTA STORAGE, INCORPORATED,

　　　　Defendant – Appellant.

Appeals from the United States District Court
for the Southern District of Texas

Before WIENER, ENGELHARDT, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

Hewlett-Packard Company[1] ("HP") sued Quanta Storage, Inc. ("Quanta") for illegally fixing the prices of optical disk drives. Quanta risked bet-the-company litigation and lost, so the district court ordered it to hand over the company. Quanta argues that the evidence was insufficient to justify the $438.65 million award against it and that the district court's orders enforcing the judgment should be set aside. For the reasons below, we affirm the judgment but vacate in part the enforcement orders.

---

[1] Mid-lawsuit, Hewlett-Packard Company changed its name to HP, Inc.

No. 19-20799
c/w No. 20-20235

I.

This case consists of two consolidated appeals. The first arises from the district court's damages award. The second arises from the district court's enforcement orders. We summarize both in turn.

A.

Quanta makes optical disk drives ("Drives") for computers. From 2003 to 2009, Quanta took part in a conspiracy with other Drive manufacturers to fix prices for the product. HP and its subsidiaries purchased Drives from Quanta and other cartel members during this period. These Drives were incorporated into HP computers.

After foreign antitrust regulators caught wind of the cartel, so did the plaintiffs' bar. HP sued Quanta and other Drive suppliers in the Southern District of Texas. The lawsuit was transferred to the Northern District of California as part of the Optical Disk Drive Products Antitrust Multidistrict Litigation. Most suppliers settled. Quanta did not. So the transferee court remanded HP's suit against Quanta back to the transferor court in Texas.

In October 2019, a six-day jury trial ensued. Important to this appeal, the jury heard from HP's damages expert, an economist named Dr. Debra Aron. Over an objection from Quanta, Dr. Aron testified that, according to her damages model, HP was overcharged $176.3 million for Drives.

At the close of trial, Quanta moved orally for judgment as a matter of law. Quanta argued that "the jury d[id] not have [a] sufficient evidentiary basis to determine with reasonable certainty the amount of damages Hewlett-Packard Company ha[d] suffered." The district court denied the motion.

The jury unanimously found in favor of HP, concluding that Quanta participated in the Drive cartel and that price-fixing caused HP to overpay for Drives by $176 million. Quanta renewed its motion for judgment as a matter

of law. It also moved for a new trial on the basis that "the jury's damages finding [wa]s against the great weight of evidence and based on evidence that should not have been admitted." Both motions were denied. After trebling the damages (as is permitted in civil antitrust cases) and reducing the award to account for certain settlement payments, the district court entered final judgment for HP in the amount of $438,650,000. Quanta timely appealed, challenging only the damages award and not the finding of liability.

## B.

Having won a judgment, HP wanted its money. After unsuccessful attempts to collect in early 2020, HP moved on March 30, 2020, for a writ of execution. The federal rules provide judgment creditors the enforcement tools available under the law of the state in which the court is located. FED. R. CIV. P. 69(a)(1). And Texas law empowers a court to "order the judgment debtor to turn over . . . property . . . to a designated sheriff or constable for execution," or to "appoint a receiver . . . to take possession of the . . . property, sell it, and pay the proceeds to the judgment creditor." TEX CIV. PRAC. & REM. CODE § 31.002(b)(1), (3). HP requested both.

On April 1, the district court declined to appoint a receiver. But it granted the writ of execution and ordered "the turnover of all of [Quanta's] . . . property." That was the "First Turnover Order." As the name suggests, it wasn't the last.

Less than two weeks later, frustrated by what it considered to be Quanta's intransigence, HP filed an order to show cause why Quanta should not be held in contempt for violating the First Turnover Order. In response, Quanta noted that the order did not contain a deadline and that it was working to turn over assets. Quanta's response included a declaration from Jake Wang, Quanta's head of legal. Wang explained that Taiwanese securities laws

No. 19-20799
c/w No. 20-20235

required Quanta to take certain steps before it could dispose of its Taiwanese and Chinese property. Wang represented that Quanta was beginning that process, but COVID-19 had slowed the company down. In a subsequent filing, however, Quanta appeared to take the opposite position. It claimed that Taiwanese law and principles of international comity meant Quanta could not be compelled to begin the judgment-recognition process in Taiwan.

In a terse order dated April 22, the district court rejected Quanta's arguments under Taiwanese law and principles of international comity. The court denied HP's motion for a show-cause hearing, but gave Quanta until May 1 "to fully comply with the [First] Turnover Order . . . or to show cause as to why Quanta should not be immediately held in contempt . . . and sanctioned [at] a rate of $50,000.00 per day." That was the "Second Turnover Order."

Quanta responded by asking the court to clarify the intended recipient of Quanta's assets. Texas law prohibits a court from ordering a turnover directly to the judgment creditor. *Ex parte Johnson*, 654 S.W.2d 415, 419 (Tex. 1983); *see also* TEX CIV. PRAC. & REM. CODE § 31.002(b)(1) (requiring that a court's turnover order direct the transfer of property "to a designated sheriff or constable for execution"). Quanta had previously told the court that it "was reaching out to the office of Constable Alan Rosen," the constable designated by HP. But in this motion Quanta claimed the earlier orders were unenforceably vague as "to whom Quanta must turn over property."

The district court obliged Quanta's request. On April 27, the district court confirmed that Constable Rosen was the appropriate recipient of the property. Because Quanta knew this before it filed its motion, the court maintained the May 1 deadline for full compliance. That was the "Third Turnover Order." Quanta timely appealed all three Turnover Orders. We consolidated the appeal with Quanta's appeal of the damages award.

4

No. 19-20799
c/w No. 20-20235

II.

First up, the appeal from the district court's award of damages. Review of denial of a motion for judgment as a matter of law is *de novo*. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir. 2013). "[W]e draw all reasonable inferences in favor of the nonmoving party." *Ibid.* (quotation omitted). We review rulings on the admissibility of expert opinion evidence for abuse of discretion. *See id.* at 881. We also apply that standard to the denial of a motion for new trial. *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998).

A.

Here, the validity of the judgment turns on the interaction between the presumption against extraterritoriality set out in the Foreign Trade Antitrust Improvements Act and Federal Rule of Evidence 703. We'll discuss the presumption first, then turn to the evidentiary issues.

1.

At English common law, there was a presumption that conduct that occurred outside the country was not actionable in English courts. *See, e.g.*, *Treacy v. DPP* [1971] AC 537, 551 ("It has been recognized from time immemorial that there is a strong presumption that when Parliament . . . creates an offence . . . , it does not intend this to apply to any act done by anyone in any country other than England."); *Lacyes Case* (1583) 74 Eng. Rep. 246 (KB) (noting Lord Coke's view that the Crown could not prosecute the defendant for murder if he "struck [the victim] upon the high-sea").

From the Founding to today, federal courts in this country have adopted the same presumption. *See, e.g.*, *Rose v. Himely*, 8 U.S. (4 Cranch) 241, 279 (1808) ("[L]egislation of every country is territorial"); *The Apollon*, 22 U.S. (9 Wheat.) 362, 370 (1824) ("[H]owever general and comprehensive the phrases

5

used in our municipal laws may be, they must always be restricted in construction, to places and persons, upon whom the Legislature have authority and jurisdiction."); *Am. Banana Co. v. United Fruit Co.*, 213 U.S. 347, 357 (1909) ("[I]n case of doubt," a statute should be construed "as intended to be confined in its operation and effect to the territorial limits over which the lawmaker has general and legitimate power."); *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none.").

The reach of federal antitrust laws has been construed accordingly. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 (1986) ("American antitrust laws do not regulate the competitive conditions of other nations' economies."); *Am. Banana*, 213 U.S. at 357 (holding that "the acts of the defendant in Panama or Costa Rica [were] not within the Sherman act").

But as the economy became more globalized in the 20th century, that presumption began to show its age. *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 n.12 (5th Cir. 2001). So "the Supreme Court relaxed its previous stance and held that the Sherman Act authorized jurisdiction over foreign defendants so long as domestic commerce was affected and some conduct occurred within the United States." *Ibid.*; *see, e.g.*, *Thomsen v. Cayser*, 243 U.S. 66, 88 (1917) ("[T]he combination affected the foreign commerce of this country and was put into operation here. It, therefore, is within the law." (citation omitted)); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 444 (2d Cir. 1945) (L. Hand, J.) ("[T]he [Sherman] Act does not cover agreements, even though intended to affect imports or exports, unless its performance is shown actually to have had some effect upon them."); *Matsushita*, 475 U.S. at 582 n.6 ("The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce.");

No. 19-20799
c/w No. 20-20235

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) ("[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States.").

Congress codified and clarified this rule when it passed (and President Reagan signed) the Foreign Trade Antitrust Improvements Act of 1982, Pub. L. No. 97-290, § 402, 96 Stat. 1233, 1246 (1982) (codified at 15 U.S.C. § 6a) (the "FTAIA"). *See F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 169 (2004) (noting that "the FTAIA's language and history suggest that Congress designed the FTAIA to clarify . . . the Sherman Act's scope as applied to foreign commerce"); *Den Norske*, 241 F.3d at 421 (similar). In relevant part, the FTAIA provides:

> [Federal antitrust laws] shall not apply to conduct involving trade or commerce (*other than import trade or import commerce*) with foreign nations unless—
>
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
>
> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; . . . and
>
> (2) such effect gives rise to a claim under the [federal antitrust laws].

15 U.S.C. § 6a (emphasis added).

In other words, imports fall within the ordinary scope of the Sherman Act. *See F. Hoffman-La Roche*, 542 U.S. at 163–64; *United States v. Hui Hsiung*, 778 F.3d 738, 754 (9th Cir. 2015) ("[I]mport trade . . . does not fall within the FTAIA at all."). But all other foreign conduct must pass a two-prong test to satisfy the strictures of the FTAIA. The conduct must (1) have "a direct, substantial, and reasonably foreseeable effect" on U.S. trade, 15 U.S.C. § 6a(1); and (2) the effect must "give rise to an antitrust cause of action." *Motorola*

7

No. 19-20799
c/w No. 20-20235

*Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 819 (7th Cir. 2015) (paraphrasing the requirement in 15 U.S.C. § 6a(2)).

2.

With that legal background in mind, HP's Drive purchases can be broken down into three categories:

- **Category 1**: The Drive was shipped directly to the United States, where it was incorporated into a computer that was sold in the United States.

- **Category 2**: The Drive was shipped to a foreign country, where it was incorporated into a computer, and the computer was shipped to and sold in the United States.

- **Category 3:** The Drive was shipped to a foreign country, where it was incorporated into a computer, and the computer was sold in a foreign country.

Category 1 purchases aren't covered by the FTAIA because they involve import commerce. So there's no question that they may form the basis of an antitrust claim. Category 3 purchases are more problematic because it's unclear how purely foreign sales can satisfy the FTAIA's effects test. But we needn't worry about that issue because HP's damages model excluded Category 3 purchases. Today's appeal focuses solely on the Category 2 purchases, which (together with Category 1 purchases) resulted in the $176 million damages award.

Quanta's appeal rests on two contentions—one factual and one legal. The factual contention is that the admissible evidence at trial revealed that it was HP's foreign subsidiaries—not HP itself—that made the Category 2 purchases. Quanta's legal contention is that the FTAIA permits recovery for Drive purchases made by HP itself, but prohibits a claim based on Drive purchases made by HP's subsidiaries—even if those Drives were later resold to HP. That's

because the so-called "indirect-purchaser" doctrine prevents indirect purchasers of cartelized products from bringing federal civil antitrust claims. *See, e.g.*, *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) ("[W]e have ruled that *indirect* purchasers who are two or more steps removed from the violator in a distribution chain may not sue."). So if HP purchased computers containing Drives from its subsidiaries abroad, it would be an indirect purchaser of the Drives and hence prohibited from suing Quanta for damages related to them. That means HP would be unable to meet the second requirement in the FTAIA: that the effects give rise to an antitrust cause of action.

B.

We need not resolve Quanta's legal contention because its factual contention is wrong. Quanta argues that no sufficient, competent evidence indicates that HP itself (rather than its subsidiaries) made the Category 2 purchases. It asserts that (1) the testimony that HP was directly responsible for the Category 2 purchases was inadmissible; (2) HP's head of procurement testified that Drives "purchased outside the United States . . . would have been purchased by HP's foreign subsidiaries"; and (3) other evidence shows that HP's foreign subsidiaries were in fact the Drive purchasers outside the United States. All three assertions are incorrect.

1.

First, the admissibility issue. During the direct examination of Dr. Aron, HP's damages expert, HP's counsel asked:

> From the data that you looked at, was it your understanding that the purchases of the DVD[] [drives] were by the plaintiff HP, Inc.?

Before Dr. Aron could answer, Quanta's counsel objected that the question "[c]alls for hearsay and [has] no foundation." The court overruled the objections

and Dr. Aron answered "yes." Quanta insists on appeal that this ruling was wrong. And, without any admissible evidence indicating that the Category 2 purchases came from HP (rather than its subsidiaries), HP cannot sustain a claim under the FTAIA. Recognizing the "wide latitude" afforded district courts "in determining the admissibility of expert testimony," we hold that the district court did not err. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997).[2]

The district court's ruling on the foundation and hearsay objection was not an abuse of discretion. The Federal Rules of Evidence permit an expert to base her opinion "on facts or data in the case that the expert has been made aware of or personally observed." FED. R. EVID. 703. And it was clear from the question that the answer sought was based on "data . . . the expert has . . . personally observed"—the "data that [Dr. Aron] looked at."

Although the data might have been hearsay, the facts on which experts rely "need not be admissible for the opinion to be admitted." FED. R. EVID. 703. They need only be "those kinds of facts or data" that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject." *Ibid.*

Dr. Aron's role at trial was to sift through HP's sales data and calculate the losses caused by the cartel's price-fixing. It was that sales data that told her which entity made which purchases:

> [W]e did quite a lot of work to understand the data that we received; and it was my understanding, based on that work, that the data was purchases by the plaintiff HP, Inc. formerly known as Hewlett-Packard Company.
> . . .

---

[2] HP claims that Quanta neglected to raise the admissibility argument during its motion for judgment as a matter of law, and that the argument is therefore subject to plain-error review. We do not decide this issue because Quanta's admissibility argument fails even under the ordinary abuse-of-discretion standard for preserved admissibility challenges.

No. 19-20799
c/w No. 20-20235

> In the data files that I received, the transactions identified the supplier; and in *any cases in which the supplier was identified as an HP entity, I excluded those . . . .*

(Emphasis added.) When raising the objection, Quanta argued only that the evidence was hearsay. Quanta did not argue that Dr. Aron could not reasonably rely on the sales data. Regardless, we see no error in the district court's view (implicit in its ruling) that an expert on calculating damages from sales data may reasonably rely on sales data to form her opinion.

Quanta augments its argument with a separate portion of Dr. Aron's testimony. There, she testified that "the data were represented to [her] as being" "purchases for [Drives] . . . by" HP. This use of the passive voice, Quanta claims, reveals the existence of a "mystery out-of-court declarant" who was never identified and who might not be reliable for Rule 703 purposes. But Dr. Aron quickly clarified her statement:

> As I also mentioned in my testimony earlier, where the data identified the supplier as being another HP entity, like an HP subsidiary, I removed those transactions from the data.

Mystery solved.[3]

Dr. Aron testified that the $176 million damages figure was reached using purchases only by HP. That testimony was admissible.

2.

On to the procurement testimony. The jury heard from HP's head of procurement, Russell Hudson. Quanta argues Hudson admitted that foreign

---

[3] In its reply brief, Quanta attempts to recharacterize Dr. Aron's statements to suggest that she did *not* exclude purchases by foreign subsidiaries. But on appeal from a denial of a motion for judgment as a matter of law, our review of the record affords the nonmovant the benefit of all reasonable inferences, and we do not engage in a reweighing of the evidence. *See Wellogix*, 716 F.3d at 874; *Miller v. Travis Cty.*, 953 F.3d 817, 819 (5th Cir. 2020). A permissible reading of Dr. Aron's testimony is that she excluded from her damages model purchases by HP's foreign subsidiaries. And because HP is the nonmovant, that is the reading we must adopt for purposes of this appeal.

11

subsidiaries made the foreign Drive purchases. This is premised on a misrepresentation of the record. More than once in its brief, Quanta represented that Hudson "testified that, if drives (ODDs) were purchased outside the United States, they would have been purchased by HP's foreign subsidiaries." That's not what the record says. Here's the actual exchange from the trial transcript:

> Q. And so in a procurement event you have an ODD supplier and a purchaser, an entity that purchases. Did HP, Inc. . . . was that the purchaser in all of these procurement events that you have described?
> A. It was some form of HP. I don't know that it was HP, Inc., but it was a legal entity of HP, somewhere in the region that these were purchased, that purchased the drives.
> Q. So the purchaser might not have been HP, Inc. at a particular procurement event? It might have been some subsidiary of HP, Inc.?
> A. It could well have been, yes. . . . I'm not exactly sure on how that was spread out, but it could very well have been.

As Quanta's counsel admits elsewhere in its brief, the most this testimony shows is that Hudson wasn't sure which entities made which purchases. But Dr. Aron *was* sure—and she explained why. *See* Part II.B.1, *supra.* If there's any disparity between the two witnesses' answers, the verdict reveals that the jury chose to give more weight to Dr. Aron's testimony. And we will not interfere with the jury's credibility determination. *See Miller v. Travis Cty.*, 953 F.3d 817, 819 (5th Cir. 2020) (explaining that, on review of a motion for judgment as a matter of law, "we . . . do not evaluate credibility or weigh the evidence"). Thus, on appeal, Hudson's apparent uncertainty doesn't help Quanta.

No. 19-20799
c/w No. 20-20235

3.

Last, Quanta points to other portions of the record that, in its view, require judgment as a matter of law, or a finding that the great weight of the evidence is in its favor. Not so.

Quanta spends several pages of its brief noting that Hudson, the European Commission, and HP itself all acknowledge that HP's foreign subsidiaries purchased Drives.[4] This is a red herring. No one disputes that Category 3 purchases (Drives shipped and sold abroad) like these took place. But the evidence also shows that Drives that never ended up in U.S. computers—or that were purchased by HP subsidiaries—were excluded from the damages model. Thus, the existence of foreign purchases does not undermine the reliability of the damages calculation.

Again, the district court properly denied Quanta's motion for judgment as a matter of law. And we must reject a great-weight-of-the-evidence challenge unless the movant has made "a clear showing of an absolute absence of evidence to support the jury's verdict." *Whitehead*, 163 F.3d at 269 (quotation omitted). Quanta has not made such a showing. The money judgment stands.

---

[4] Quanta's reliance on a fining decision by the European Commission is puzzling. The document appears to be a trial exhibit, but Quanta does not explain for what purpose the decision was admitted and whether its contents may be considered for the truth of the matters asserted. *Cf. United States v. del Carpio Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs." (quotation omitted)). The portions of the decision Quanta cites come from a section where the European Commission dismisses objections to its jurisdiction. It's not clear why we should credit the self-interested, untested allegations of a regulatory body made while wielding the dual role of prosecutor and judge. *Cf. Advanced Micro Devices, Inc. v. Intel Corp.*, 2002 WL 1339088, at *1 (N.D. Cal. Jan. 7, 2002) ("The [European] Commission, in the conduct of an investigation, performs the functions of investigator, prosecutor and decision-maker without any separation.").

No. 19-20799
c/w No. 20-20235

III.

Quanta also appeals the Turnover Orders.[5] Both parties agree that we have jurisdiction, but they disagree as to why. Even if there were complete consensus between the parties on this point, we would still "have an independent obligation to assess our own jurisdiction before exercising the judicial power of the United States." *MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 313 (5th Cir. 2019). We conclude that we have jurisdiction, then we explain why the Turnover Orders must be vacated in part.

A.

Jurisdiction first. Quanta suggests that we may proceed under 28 U.S.C. § 1292(a)(2). That section grants courts of appeals jurisdiction over appeals from:

> Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property.

28 U.S.C. § 1292(a)(2). But here's the problem: The district court *declined* to appoint a receiver. If we have jurisdiction, § 1292(a)(2) is not the reason why. *See* 16 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3925 (3d ed. 2020) [hereinafter WRIGHT & MILLER] ("[T]here is no general authority to appeal from an order refusing to appoint a receiver.").[6]

---

[5] Quanta used Part One of its reply brief in the turnover appeal to respond to points raised in HP's brief in the money-judgment appeal. That was improper. The purpose of a reply brief is just that—to "reply to the appellee's brief." FED. R. APP. P. 28(c). The appeal from the judgment and the appeal from the Turnover Orders are the subjects of separate appeals, even though we decide both today. Part One of Quanta's May 26 reply brief was therefore an unauthorized supplemental brief. *See ibid.* But because we affirm HP's judgment, we deny as moot HP's motion to strike the May 26 reply brief.

[6] The Third Turnover Order instructed Quanta to transfer its assets to Constable Rosen. That does not make the constable a "receiver." *See* TEX. CIV. PRAC. & REM. CODE § 31.002(b)(3) (permitting a court to appoint a receiver as an alternative to ordering the turnover of property to a constable); *Lozano v. Lozano*, 975 S.W.2d 63, 68–69 (Tex. App.—

No. 19-20799
c/w No. 20-20235

We think the better jurisdictional hook is one suggested by HP, 28 U.S.C. § 1291. That provision, the typical route to a court of appeals, grants us "jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. The term "final decision[]" means more than just a "final judgment." *See Williams v. Taylor Seidenbach*, 958 F.3d 341, 369 (5th Cir. 2020) (en banc) (Oldham, J., dissenting). In addition to certain dismissals that end a case, the term encompasses decisions that "final[ly] dispos[e] of a claimed right which is not an ingredient of the cause of action and does not require consideration with it." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546–47 (1949). That includes certain post-judgment orders. *United States v. Parker*, 927 F.3d 374, 380 (5th Cir. 2019).

Orders permitting enforcement of judgments or requiring defendants to transfer property to plaintiffs might not take the form of judgments, but they certainly dispose of claims to that property. And these types of orders have long been treated as final and appealable. *See, e.g., Boyle v. Zacharie*, 31 U.S. (6 Pet.) 648, 656 (1832) (Story, J.) ("If . . . there is an erroneous award of execution, not warranted by the judgment, or erroneous proceedings under the execution, a writ of error will lie to redress the grievance."); *Thomson v. Dean*, 74 U.S. 342, 346 (1868) ("[W]hen the decree . . . directs [property] to be delivered up by the defendant to the complainant, . . . or directs the defendant to pay a certain sum of money to the complainant, and the complainant is entitled to have such decree carried immediately into execution, the decree must be regarded as a final one." (quotation omitted)); *Carondelet Canal & Navigation Co. v. Louisiana*, 233 U.S. 362, 372–73 (1914) (finding "distinct and explicit finality" from an order requiring defendant to deliver its property "into the possession

---

Houston [14th Dist.] 1998, pet. denied) (discussing the different roles of a constable and a receiver under the Texas Code).

and administration" of plaintiff); *Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 126 (1945) (reaffirming the finality rule in *Thomson v. Dean*); 15A WRIGHT & MILLER § 3910 ("Appeals continue to be permitted from orders that direct immediate execution of judgment or delivery of property to an opposing party . . . ."); *id.* § 3916 ("Orders relating to the enforcement, execution, or interpretation of a final judgment ordinarily should be final upon complete disposition of all present related issues.").

Quanta's turnover appeal falls squarely within this long line of cases: The company asks us to review the propriety of an order granting a writ of execution and requiring Quanta to turn over essentially all its property to defendant (via Constable Rosen). We therefore hold that the Turnover Orders are final and that review is proper under 28 U.S.C. § 1291. *Cf. Parker*, 927 F.3d at 380 (concluding that an order denying a motion to quash a writ of execution was "a final decision under § 1291"); *Sobranes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp.*, 509 F.3d 216, 220 (5th Cir. 2007) (holding that an order barring judgment creditor from executing on the judgment was a final decision under § 1291); *Maiz v. Virani*, 311 F.3d 334, 339 n.4 (5th Cir. 2002) (reviewing turnover orders under the Texas Code and "assert[ing] jurisdiction . . . under the collateral order doctrine" "to the extent that the[] orders are properly characterized as interlocutory"); *Smith v. Revie (In re Moody)*, 817 F.2d 365, 368 (5th Cir. 1987) (holding that a turnover order in adversary bankruptcy proceedings was final); *Cent. States, Se. & Sw. Areas Pension Fund v. Express Freight Lines, Inc.*, 971 F.2d 5, 6 (7th Cir. 1992) (opining that "a postjudgment order . . . that concludes the collection proceeding is the judgment from which the defendant can appeal").[7]

---

[7] If we are incorrect that the Transfer Orders are final, we would still have appellate jurisdiction over interlocutory orders "granting, continuing, modifying, refusing or dissolving

No. 19-20799
c/w No. 20-20235

B.

Certain of our jurisdiction, we turn to the Turnover Orders themselves. We review them for abuse of discretion—that is, we reverse only if "the trial court acted unreasonably, arbitrarily, or without reference to guiding rules or principles under the [state] turnover statute." *Maiz*, 311 F.3d at 338. "[A] trial court's failure to properly analyze the law or apply it to the facts is [also] an abuse of discretion." *Ibid.*; *accord Af-Cap, Inc. v. Republic of Congo*, 462 F.3d 417, 425 (5th Cir. 2006).

Quanta argues that the Turnover Orders should be set aside for three reasons: (1) they violate principles of Taiwanese law and principles of international comity; (2) Quanta needs more time to complete the procedural steps required for turning over Taiwanese property; and (3) the Turnover Orders are unenforceably vague. We reject (1) and (3) but agree with Quanta on (2).

1.

We start with Taiwanese law and international comity. In the district court, Quanta argued that it was impossible to comply with the Turnover Orders until after domestication of the judgment in this case. The district court summarily rejected this argument:

---

injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). "In determining what is an appealable order under 28 U.S.C. § 1292(a)(1), courts look not to terminology, but to the substantial effect of the order made." *McCoy v. La. State Bd. of Educ.*, 345 F.2d 720, 721 (5th Cir. 1965) (per curiam) (quotation omitted). Accordingly, we have held that § 1292(a)(1) "applies to orders that are directed to a party, enforceable by contempt, and designed to accord . . . some or all of the substantive relief sought in the complaint in more than a temporary fashion." *Police Ass'n of New Orleans v. City of New Orleans*, 100 F.3d 1159, 1166 (5th Cir. 1996) (Wisdom, J.) (quotation omitted). The Turnover Orders meet those criteria. *Cf. Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1225 (7th Cir. 1993) (holding that imposition of a resulting trust on a property in aid of enforcing a judgment was "an order of specific performance, hence an injunction, hence appealable regardless of finality" (citation omitted)).

No. 19-20799
c/w No. 20-20235

> The Court notes Quanta asserts principles of comity and Taiwanese law preclude Quanta's compliance with the Turnover Order. Based on the plain language of the Turnover Order and the Court's jurisdiction over this case and Quanta, the Court disagrees.

We agree with the district court. Quanta now appears to concede Taiwanese law does not require domestication of a judgment to effectuate a property transfer. Instead, it says that compliance with the Turnover Orders would require a board vote. And according to Quanta's head of legal, the board, "in his opinion," would not approve a "major asset disposition . . . unless that judgment has been domesticated . . . by a Taiwanese court."

With the greatest respect to Quanta and its board, that is an internal corporate problem, not a judicial one. There is no question that the district court has jurisdiction over Quanta. Under Texas law, a court may require parties subject to its jurisdiction to turn over property, even if that property is located abroad. *See Reeves v. Fed. Sav. & Loan Ins. Corp.*, 732 S.W.2d 380, 381 (Tex. App.—Dallas 1987, no writ) ("It is clear that Texas law permits a court to compel a person, over whom it has jurisdiction, to turn over realty located outside the State of Texas."); *cf. United States v. First Nat'l City Bank*, 396 F.2d 897, 900–01 (2d Cir. 1968) ("It is no longer open to doubt that a federal court has the power to require the production of documents located in foreign countries if the court has in personam jurisdiction of the person in possession or control of the material."). Because it will not violate Taiwanese law to approve the asset transfer without domestication, Quanta's board has a simple choice: obey the district court's Turnover Orders or risk contempt proceedings.

Quanta also raises concerns about international comity. But these concerns—which are noticeably unaccompanied by caselaw—are premised on the view that the damages in this case relate to Drive purchases by HP

No. 19-20799
c/w No. 20-20235

subsidiaries abroad. We have already rejected Quanta's argument that the damages model included such purchases. *See* Part II.B.1, *supra*. We similarly reject the comity argument.

2.

Quanta's second argument is more persuasive. In the district court, Quanta explained that it was impossible to comply with the Turnover Orders before satisfying certain procedures required by Taiwanese law—including obtaining two independent, professional appraisals of its assets in China and Taiwan (valued in the hundreds of millions of dollars). Quanta told the district court that pandemic-related shutdowns would prevent it from completing the appraisal process in a matter of weeks. Alternatively, Quanta said it could seek approval for the transfer from a Taiwanese court, but that process would also be delayed by the pandemic. Quanta supported these contentions with an affidavit from a Taiwanese lawyer.

In response, HP broadly asserted (with no supporting evidence from a Taiwanese legal practitioner) that Quanta's understanding of Taiwanese law was wrong. The district court agreed with HP and gave Quanta nine days to comply with the Turnover Orders. Only *after* the district court's ruling did HP supply an affidavit from a Taiwanese lawyer—and it *agreed* that certain of the non-U.S. property would have to be appraised.

In light of this one-sided evidence in Quanta's favor, we are concerned that the May 1 turnover deadline was unreasonable. It is not apparent from the record that the district court considered the amount of time it would take for Quanta to complete the asset transfer process required by Taiwanese law. *Cf. In re Wiese*, 1 S.W.3d 246, 250–51 (Tex. App.—Corpus Christi 1999, no pet.) (noting that a § 31.002 turnover order is voidable if it is impossible to comply

19

with). We therefore vacate the Turnover Orders to the extent they set May 1 as the deadline for Quanta to turn over property in Taiwan and China.[8]

3.

Finally, we reject Quanta's argument that the first two Turnover Orders are unenforceably vague because they do not identify the constable as the recipient of the to-be-turned-over property. In responding to HP's motion for a show-cause hearing, Quanta—and Quanta's in-house lawyer, under penalty of perjury—represented to the district court that it was already working with Constable Rosen. These representations, which preceded the Second Turnover Order, led the district court to deny the show-cause motion. Quanta cannot now maintain that it was unsure "what the court intend[ed] to require." *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." (quotation omitted)). Quanta was aware, at least as early as April 22 (the date of the Second Turnover Order), that it was required to hand over its property to Constable Rosen.

\* \* \*

The district court's money judgment is AFFIRMED. The Turnover Orders are VACATED to the extent they impose a May 1 deadline for turning over property in Taiwan and China. The Turnover Orders are AFFIRMED in

---

[8] HP contends that impossibility is a defense appropriate for contempt proceedings, but not a basis for direct appeal of the Turnover Orders. Not so. Although inability to comply *is* a defense to contempt proceedings, *see Pierce v. Vision Invs., Inc.*, 779 F.2d 302, 310 (5th Cir. 1986), a district court must nonetheless ensure that it is possible to comply with its orders. *See Maggio v. Zeitz (In re Luma Camera Serv., Inc.)*, 333 U.S. 56, 69 (1948) ("Every precaution should be taken that orders issue, in turnover as in other proceedings, only after legal grounds are shown and only when it appears that obedience is within the power of the party being coerced by the order.").

all other respects. And the matter is REMANDED for further proceedings consistent with this opinion.